# United States Court of Appeals
## For the First Circuit

No. 19-1351

UNITED STATES OF AMERICA,

Appellee,

v.

EDWIN GONZALEZ,
a/k/a SANGRIENTO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Julia Pamela Heit for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

November 17, 2020

**SELYA**, **Circuit Judge**.  Every time that the law draws an age-based line to create a protected class, there are some people who fall outside the protected class.  Those persons often regard the point at which the line is drawn as arbitrary.  This appeal is brought by a criminal defendant who argues that a particular age-based line should be redrawn to include persons of his age within the protected class.

Specifically, defendant-appellant Edwin Gonzalez takes aim at a line drawn by the Supreme Court, as a matter of constitutional interpretation, which protects juvenile offenders (that is, offenders who are not yet eighteen years of age at the time that the charged crime was committed) but not adult offenders (that is, offenders who were eighteen years of age or older when the charged crime was committed) from certain life-without-parole sentences.  See Miller v. Alabama, 567 U.S. 460, 465 (2012) (holding mandatory life-without-parole sentences unconstitutional for all juvenile offenders); see also Graham v. Florida, 560 U.S. 48, 82 (2010) (declaring unconstitutional life-without-parole sentences for non-homicide juvenile offenders).  Refined to bare essence, Gonzalez (who was twenty years old at the time he committed the charged crime) seeks to reconfigure the age-specific line and vacate his sentence of life imprisonment without parole. In the bargain, he asks us to blur the distinction between his

discretionary life-without-parole sentence and the mandatory life-without-parole sentence examined by the Miller Court.

We conclude, for several reasons, that the defendant's claims of constitutional error are unavailing. Similarly, we conclude that his remaining claims of error are impuissant. Consequently, we uphold the life-without-parole sentence imposed by the district court.

## I. BACKGROUND

Although the relevant facts are (by the defendant's own admission) "gruesome," they are essentially undisputed. And even though the defendant's appeal targets only his life-without-parole sentence, a brief rehearsal of the factual background and procedural history helps to set the stage.

The defendant is a member of La Mara Salvatrucha, a gang colloquially known as MS-13. MS-13 has gained notoriety for the brutality of its crimes and the relative youth of both its members and its victims. The gang's reach spans the Western Hemisphere: although its leadership remains in El Salvador, many of its regional and local branches, known respectively as "programs" and "cliques," are located throughout the United States. The web woven by MS-13 is so pervasive that the federal government often refers to the gang as a transnational criminal organization.

Of particular pertinence here, MS-13 is quite active in the Boston area. Prominent MS-13 cliques exist in East Boston,

Chelsea, Everett, Lynn, and Revere. From time to time, the defendant was affiliated with several of these cliques.

The core purpose of MS-13 is to kill or maim rival gang members and collect money for MS-13's leadership. The defendant earned himself acclaim within local MS-13 circles for fulfilling this core purpose, and he received promotions within the hierarchy of an East Boston clique for committing a golconda of violent acts. These acts earned the defendant the nom de guerre "Sangriento" — "Bloody" — in recognition of the mayhem that he inflicted.

The case at hand centers around two murders that underscore the accuracy of the defendant's sobriquet. In 2015, the defendant (then age twenty) spearheaded a plan to kill Wilson Martinez, then fifteen years of age, whom the defendant suspected of being a member of the rival 18th Street Gang. The plan was complex: over a period of several months, MS-13 members created a phony Facebook account that appeared to belong to a teenage girl, sent messages to Martinez, and eventually persuaded Martinez to rendezvous with this imaginary girl at a secluded beach. When Martinez arrived, he was ambushed by the defendant and several MS-13 underlings. Martinez was robbed and stabbed repeatedly. During the course of the encounter, the defendant instructed an unarmed MS-13 acolyte to find a weapon so that the latter could participate in the attack. Following the defendant's instructions, the boy grabbed a rock and struck Martinez in the head.

After Martinez was killed, the defendant directed a clean-up. Despite the clean-up, the tip of a knife was later found next to Martinez's body. This murder gained the defendant considerable notoriety within MS-13 and led to his promotion to a position of great respect and authority. Many gang members attended the promotion ceremony.

In eerily similar circumstances, the defendant (still age twenty) orchestrated the January 2016 murder of Cristofer de la Cruz, then sixteen years old, who was suspected of membership in the 18th Street Gang. The defendant used the same ruse, luring the victim to danger under the guise of a date with a teenage girl. MS-13 members picked up de la Cruz in a nearby town, pretending to be relatives of the imaginary girl. Another ambush occurred when de la Cruz reached East Boston: the defendant and three other MS-13 members stabbed de la Cruz some forty-eight times. Once again, the defendant organized a clean-up, ordering gang members to bury weapons and soiled clothing. A cooperating witness subsequently directed the authorities to the burial site, leading to the recovery of many of the weapons. Some of the items recovered contained the DNA of both the defendant and the victim.

In due course, a federal grand jury sitting in the District of Massachusetts returned an indictment that — as relevant here — charged the defendant with violating the Racketeer Influenced and Corrupt Organizations Act (RICO), see 18 U.S.C.

§ 1962(d).  In the indictment, the grand jury charged the murders of Martinez and de la Cruz as predicate acts of the RICO conspiracy.  A jury was empaneled, and a trial ensued.

The district court instructed the jury on second-degree murder with respect to the predicate offenses on the theory that first-degree and second-degree murder resulted in the same statutory penalties under RICO.  The jury found the defendant guilty as charged.

A presentence investigation report (PSI Report) was prepared, which calculated the defendant's base offense level at forty-three premised on a cross-reference to the first-degree murder guideline.  See USSG §2A1.1(a).  The PSI Report also recommended various enhancements, which are of scant importance: an offense level of forty-three, in and of itself, calls for a life sentence regardless of the defendant's criminal history.  See USSG ch.5, pt. A.  The defendant objected to the PSI Report, contending that the base offense level should be set by cross-reference to the second-degree murder guideline.

At the disposition hearing, the district court concluded that it was within the court's discretion to determine, by a preponderance of the evidence, the degree of murder that was relevant for sentencing purposes.  Finding that both murders were premeditated, the court accepted the guideline calculation adumbrated in the PSI Report.  When offered an opportunity to

allocute, the defendant stood mute and chose not to express any remorse.

The district court imposed a sentence of life imprisonment without the possibility of parole. Even though the court considered mitigating factors (such as the defendant's youth, the possibility of his reformation, his challenging upbringing, and the peer pressures associated with gang membership), it found those factors vastly outweighed by the heinous nature of the crime and the defendant's stolid lack of remorse.[1] This timely appeal, which is directed exclusively at the defendant's sentence, followed.

## II. ANALYSIS

We divide our analysis into three principal segments, corresponding with the components of the defendant's asseverational array. We start with the defendant's challenge to the district court's first-degree murder determination, proceed to assess the defendant's Eighth Amendment challenge, and conclude

---

[1] Although the court did not make an explicit finding of permanent incorrigibility, it did consider the defendant's capacity for rehabilitation. At the disposition hearing, the court acknowledged that youthful offenders frequently have the capacity to change. Here, however, the court concluded that the defendant's crimes — including multiple killings on multiple occasions — reflected calculation, not immaturity. Taken as a whole, the court's statements strongly suggest that it believed the defendant was beyond hope of redemption.

- 7 -

with an appraisal of the defendant's critique of the reasonableness of his sentence.

## A.   The First-Degree Murder Determination.

At sentencing, the district court determined that — for purposes related to the application of the sentencing guidelines — the defendant had twice committed the predicate offense of first-degree murder, notwithstanding that the jury had been instructed only on second-degree murder.  The defendant assigns error in two respects.  First, he says that the determination violates his constitutional rights because only a jury, not a judge, has the responsibility of finding beyond a reasonable doubt any fact that increases a mandatory minimum sentence.  Second, he says that because the RICO statute references state crimes as predicate offenses, state procedural rules regarding who determines the degree of murder should control with respect to those crimes.  We address these assignments of error separately.

**1.   The Alleyne Challenge.**  The defendant's first claim of error is premised on his reading of the Supreme Court's decision in _Alleyne_ v. _United States_, 570 U.S. 99 (2013).  Because the defendant preserved this claim before the district court, our review is de novo.  See _United States_ v. _Batchu_, 724 F.3d 1, 7 (1st Cir. 2013).  The central question is whether the defendant's constitutional rights (either his Sixth Amendment right to a jury trial or his Fifth Amendment due process rights) were abridged

- 8 -

when the sentencing court, acting as a factfinder, determined by a preponderance of the evidence that he had twice committed first-degree murder. See U.S. Const. amend. VI; U.S. Const. amend V.

The Supreme Court has held that any fact (other than the presence of a prior conviction) that requires an increase in the statutory penalty for a crime must be submitted to the jury and found beyond a reasonable doubt. See Apprendi v. New Jersey, 530 U.S. 466, 483 n.10, 490 (2000). Subsequently, the Court held that any fact that necessitates an increase in the mandatory minimum sentence for a crime constitutes the type of fact contemplated in Apprendi and, thus, must be found by the jury beyond a reasonable doubt. See Alleyne, 570 U.S. at 103.

The defendant hitches his claim of error to Alleyne, but Alleyne cannot pull the weight that the defendant seeks to have it haul. The Alleyne holding does not preclude judicial factfinding undertaken for purposes of constructing a defendant's advisory guideline sentencing range (GSR). See United States v. Monteiro, 871 F.3d 99, 116 (1st Cir. 2017); United States v. González, 857 F.3d 46, 60-61 (1st Cir. 2017); United States v. Cox, 851 F.3d 113, 120 (1st Cir. 2017); United States v. Ramírez-Negrón, 751 F.3d 42, 48 (1st Cir. 2014); see also Alleyne, 570 U.S. at 116 (explaining that "broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment"). We

- 9 -

hold, therefore, that the defendant's <u>Alleyne</u>-based challenge is dead on arrival.

**2. The Murder-Determination Challenge.** Notwithstanding the jury's antecedent finding that the defendant had committed second-degree murder, the district court — at sentencing — made a finding that the defendant had committed first-degree murder. The defendant challenges this latter finding, arguing (in effect) that the district court erred inasmuch as Massachusetts law, under which the RICO predicate offenses arose, requires a jury rather than a judge to determine guilt with respect to murder. Relatedly, the defendant attempts to raise doubts about the district court's jury instructions.

We need not linger long over the defendant's vague references to potentially defective jury instructions. The defendant's brief makes clear that he only contests his "punishment," not his conviction, and the only relief that he seeks is vacatur of his sentence. Given this singular focus, we treat any claim of instructional error as waived.[2]

With respect to sentencing, the defendant's reliance on Massachusetts law is mislaid. The Massachusetts statute regarding murder limns the procedure for determining a defendant's guilt at

---

[2] In view of this holding, we need not address the government's argument that the defendant's claim of instructional error is underdeveloped and, thus, should be deemed abandoned. See <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

trial.  See Mass. Gen. Laws ch. 265 § 1.  It says nothing about sentencing procedures.

The issue in this case involves the district court's determination, at sentencing, that the defendant had committed first-degree murder.  To assess the supportability of that determination, we look to federal sentencing law and, in particular, the federal sentencing guidelines.  To determine the base offense level for a RICO conviction, an inquiring court must look to the relevant conduct guideline:  USSG §1B1.3.  See United States v. Carozza, 4 F.3d 70, 74-75 (1st Cir. 1993).  For this purpose, relevant conduct includes "all acts and omissions committed . . . commanded . . . or willfully caused by the defendant," USSG §1B1.3(a)(1)(A), in furtherance of the "jointly undertaken criminal activity" or "enterprise," id. §1B1.3(a)(1)(B); see Carozza, 4 F.3d at 83.  A sentencing court, faced with the question of whether a murder should be deemed relevant conduct in a particular case, may make that determination based upon a preponderance of the evidence.  See Carozza, 4 F.3d at 80-82.

In the case at hand, the district court made the requisite findings, articulated its rationale, determined that the defendant had committed two murders that comprised relevant conduct, and correctly calculated the resultant base offense level.  See USSG §2A.1.1.  The sentencing guidelines supply the

linchpin for these determinations; Massachusetts law was irrelevant. Thus, we uphold the challenged determinations.

### B. The Eighth Amendment Challenge.

The defendant next challenges his life-without-parole sentence on Eighth Amendment grounds. His chief complaint is that such a sentence — when imposed with respect to a criminal defendant who, like himself, was only twenty years old at the time of the offense of conviction — violates the constitutional prohibition against cruel and unusual punishment. See U.S. Const. amend. VIII. Alternatively, he complains that his sentence offends the Eighth Amendment because it does not rest on an antecedent finding that he was permanently incorrigible. We address these complaints in turn.

**1. Redrawing the Age-Specific Line.** The defendant's principal constitutional claim begins with Miller, in which the Court held that mandatory life-without-parole sentences were unconstitutional when imposed on juvenile offenders (that is, defendants who were below the age of eighteen when their offenses were committed). See 567 U.S. at 465. Building on this foundation, the defendant argues that the Constitution requires that all offenders below the age of twenty-one receive similar consideration even in instances involving discretionary (rather than mandatory) life-without-parole sentences. At sentencing, the defendant preserved this argument for appeal and, thus, we review

it de novo.  See United States v. Raymond, 697 F.3d 32, 40 (1st Cir. 2012); United States v. Polk, 546 F.3d 74, 75 (1st Cir. 2008).

The first roadblock that the defendant encounters in his effort to extend Miller is that, in Miller, the Supreme Court invalidated only mandatory life-without-parole sentences for juveniles.  See 567 U.S. at 489.  The Miller Court made no constitutional pronouncement one way or the other with respect to discretionary life-without-parole sentences.  Miller is distinguishable, then, because the life-without-parole sentence in this case is a discretionary one.

Of course, in considering the retroactivity of its decision in Miller, the Supreme Court stated that a life-without-parole sentence — whether mandatory or discretionary — "violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'"  Montgomery v. Louisiana, 136 S. Ct. 718, 734 (2016) (quoting Miller, 567 U.S. at 479).  Even so, this statement did not prohibit discretionary life-without-parole sentences, and it does not support the defendant's argument that Miller should be extended to ban discretionary (as well as mandatory) life-without-parole sentences for twenty-year-old offenders.

The defendant nonetheless contends that we should apply the Miller rule to all life-without-parole sentences, whether mandatory or discretionary, imposed on youthful defendants (that

- 13 -

is, defendants who were below the age of twenty-one when they committed their crimes of conviction). In his view, the mandatory/discretionary dichotomy is irrelevant. Inasmuch as the defendant argues that Miller turns principally on the age of a defendant rather than on whether the defendant's life-without-parole sentence is mandatory or discretionary, we proceed to confront his argument on its own terms.

Beyond his attempt to blur the distinction between mandatory and discretionary sentences, the driving force behind the defendant's argument is the notion that Supreme Court precedent treating offenders who are under the age of eighteen differently than young adults is based on outdated science. In the defendant's view, the modern scientific consensus demands an upward revision of the Miller line.

With respect to the genesis of the line that it drew, the Miller Court acknowledged that "children are constitutionally different from adults for purposes of sentencing." 567 U.S. at 471. Acting upon this principle in other settings, the Court has declared certain punishments unconstitutional for juveniles without declaring them unconstitutional for adults. See, e.g., Graham, 560 U.S. at 82 (holding unconstitutional life-without-parole sentences for juvenile offenders convicted of non-homicide crimes); Roper v. Simmons, 543 U.S. 551, 568 (2005) (invalidating death penalty for all offenders under age of eighteen). On those

- 14 -

occasions, the Court extended the relevant Eighth Amendment protections only to those under age eighteen.  See Miller, 567 U.S. at 465; Graham, 560 U.S. at 74-75; Roper, 543 U.S. at 568.

The defendant argues that the line should be redrawn as scientific research reveals more about when the brain has matured into adulthood.  This argument assumes, though, that the raison d'être behind the Court's age-specific decisions rests exclusively on the science surrounding brain development.  But a close reading of the relevant decisions does not indicate that the Court based them solely on scientific research.  And although Eighth Amendment jurisprudence requires courts to exhibit flexibility to comport with "the evolving standards of decency that mark the progress of a maturing society," Miller, 567 U.S. at 469 (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)), scientific evidence is merely one factor, among an array of factors, that the Court has considered when invalidating certain criminal sentences imposed on juveniles.  In this appeal, the defendant fails adequately to explain why the multitude of factors comprising the Eighth Amendment inquiry compel an extension of Eighth Amendment protections to a defendant who was twenty years old when he committed the offense of conviction.  We explain briefly.

The seminal case is Roper, in which the Supreme Court held that the Eighth Amendment prohibited the death penalty for a defendant who was under the age of eighteen at the time of the

offense of conviction. See 543 U.S. at 568. The Court relied heavily on the general consensus among states that the death penalty should not be imposed on juveniles. See id. at 564-68. So, too, the Court identified several other factors supporting its conclusion that juveniles could not be considered blameworthy enough to be subjected to capital punishment. For example, the Court pointed to a lack of maturity and sense of responsibility found generally among juveniles, the susceptibility of juveniles to environmental pressures and negative external influences, and the fact that juveniles' overall character is not yet fully formed because of their youth. See id. at 569-70. As part of its holistic analysis of how these factors diminish the culpability of a juvenile, the Court referred to scholarly works, both scientific and sociological, supporting the conclusion that reckless and impetuous decisions are more common among juveniles because of physiological considerations. See id. at 569.

Contrary to the defendant's importunings, the Roper Court did not attempt to use scientific consensus surrounding brain development as an exclusive rationale for drawing its age-specific line at eighteen. Empirical studies were mentioned only as further support for the proposition that juveniles — as compared to adults — possess a diminished sense of responsibility. See id. ("[A]s any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, '[a] lack of

maturity and an underdeveloped sense of responsibility are found in youth more often than in adults.'" (quoting Johnson v. Texas, 509 U.S. 350, 367 (1993))).  In the same vein, Roper alluded to a number of activities (such as voting, serving on juries, and marrying without parental consent) that traditionally become acceptable only for those eighteen and older — traditions that are predicated on the notion that, by age eighteen, people usually have developed a deeper sense of responsibility and accountability for their actions.  See id.

Nothing in Roper leads us to believe that the Justices drew the line at age eighteen based exclusively on their perception of a scientific certainty that an individual's brain and cognitive functions undergo a metamorphosis at precisely that age.  Instead, the Court's cases indicate that the Justices decided to go as far as the age of eighteen after carefully balancing a multiplicity of environmental and societal factors.  See, e.g., id. at 570 (discussing juveniles' lack of control over their "immediate surroundings" and inability to escape "negative influences"); id. at 564 (citing national consensus among state legislatures against executing juvenile offenders).  The Court drew the line at eighteen not because that age marked the apotheosis of full-scale physiological development but, rather, because it represented "the point where society draws the line for many purposes between childhood and adulthood."  Id. at 574.

Subsequent Supreme Court case law confirms this reading of Roper. In Graham, the Court held that life-without-parole sentences for juvenile offenders in non-homicide cases contravened the Eighth Amendment. See 560 U.S. at 82. As in Roper, the Graham Court identified a myriad of factors supporting the conclusion that persons under the age of eighteen do not have sufficient culpability to justify the harshest of sentences. See id. at 68. Consistent with its approach in Roper, the Graham Court referenced scientific findings as one type of evidence, among many, that warranted distinctions between adults and juveniles. See id.

So, too, when the Miller Court held that mandatory life-without-parole sentences for persons who committed crimes before turning eighteen violated the Eighth Amendment, it referenced the Roper factors to explain why juveniles, as a class, were "constitutionally different from adults for purposes of sentencing." 567 U.S. at 471. While the Court acknowledged that scientific research provided support for its determination that juveniles are generally less culpable than adults, it noted that science did not furnish the sole basis for its rationale. See id. Pertinently, the Court explained that a juvenile offender's youth, including his immaturity, susceptibility to environmental pressures, and capability for reform, undermines the penological justifications for imposing a life-without-parole sentence. See id. at 472-74. Along the way, the Court made pellucid that many

attributes of youth, including malleable personalities and ephemeral cognitive traits, counselled in favor of applying the Eighth Amendment's proscription to mandatory life-without-parole sentences imposed for offenses committed by persons under the age of eighteen.[3]  See id. at 473.

The defendant's argumentation ignores (or, at least, impermissibly devalues) the Supreme Court's multifaceted approach. That argumentation, in effect, entreats us to elevate scientific research about brain development from one of many factors to the sole determinant of where a line should be drawn between youthful offenders and more mature offenders.  Had the Supreme Court articulated that its conception of youth rested exclusively on the physiological development of the brain, this argument might have some bite.  But given the diversity of factors that the Court considered as part of its Eighth Amendment analysis, movement in

---

[3] We add, moreover, that the defendant over-reads Moore v. Texas, 137 S. Ct. 1039 (2017), which did not revamp the Court's holistic approach to the Eighth Amendment.  Moore addressed only an isthmian question concerning how courts should determine if a defendant facing the death penalty "qualified as intellectually disabled."  Id. at 1044.  Far more relevant than Moore is the decision that extended Eighth Amendment protections to such individuals, which — tellingly — examined not just cognitive science but also "the judgment of legislatures that have addressed" the issue, other indicia of a developing "national consensus," and "the relationship between mental retardation and the penological purposes served by the death penalty."  Atkins v. Virginia, 536 U.S. 304, 313, 316-21 (2002).

- 19 -

one factor alone is not sufficient to warrant an extension of Miller to defendants aged eighteen to twenty.

For the sake of completeness, we note, too, that the defendant has not demonstrated that brain science has shifted seismically in the years since the Court decided Roper, Graham, and Miller. The scientific and sociological studies on which he relies and that were before the Court in those cases do not stand for the proposition that brain development ends at age eighteen. Instead, the focus of those studies was on brain development and maturity during adolescence, and many of them acknowledged that brain development continues into the early twenties.[4] The lack of evidence suggesting a breakthrough confirms what is likely an inconvenient truth from the defendant's standpoint: even though he can point to recent scholarship about the immaturity of the eighteen to twenty-year-old brain, he has failed to identify the kind of scientific breakthrough that itself might compel an

---

[4] See, e.g., Roper, 543 U.S. at 569 (citing Jeffrey Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Developmental Rev. 339 (1992)); id. (citing Laurence Steinberg & Elizabeth S. Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psych. 1009 (2003)). Amicus briefs in this trio of cases likewise cited studies documenting continued brain development in adolescents "to at least age 22." Brief for American Psychological Association et al. as Amici Curiae at 11 (filed in Roper); see Brief of American Medical Association et al. as Amici Curiae at 20-21 (filed in Graham) (describing research explaining that the prefrontal cortex continues to develop "beyond adolescence").

extension of <u>Miller</u>, given the more holistic analysis that the Eighth Amendment demands.

To say more about this claim would be to paint the lily. The research available to the Justices when they decided <u>Roper</u>, <u>Graham</u>, and <u>Miller</u> suggested the conclusion that individuals aged eighteen to twenty might not possess fully developed brain processes. Nevertheless, after considering the scientific evidence as well as the other factors previously discussed, the Court chose to draw its age-specific line at eighteen. Accordingly, the defendant has not made the case for extending the <u>Miller</u> ban on life-without-parole sentences to offenders — like the defendant — who were in the eighteen-to-twenty age range when they committed the crimes of conviction.

**2.    Permanent Incorrigibility.**    This leaves the defendant's claim that the Eighth Amendment, at a minimum, requires an explicit finding of permanent incorrigibility before a life-without-parole sentence, whether mandatory or discretionary, may be imposed on a youthful defendant (even a young adult). Because this claim is made for the first time on appeal, our review is for plain error. See <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001). To prevail under plain-error review, an appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights,

but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id.

"The plain error hurdle is high," United States v. Hunnewell, 891 F.2d 955, 956 (1st Cir. 1989), and the defendant stumbles at the second step of the construct. At that step, the proponent of plain error must show something more than error simpliciter: he must show that the claimed error is "clear" or "obvious." United States v. Olano, 507 U.S. 725, 734 (1993). And to be "clear" or "obvious," an error must, at the very least, contradict existing law. See United States v. Bennett, 469 F.3d 46, 50-51 (1st Cir. 2006). Put another way, an error must be "indisputable" in light of controlling law to warrant correction on plain-error review. United States v. Jones, 748 F.3d 64, 69-70 (1st Cir. 2014).

The claimed error in this case does not pass through this screen. The defendant points to no controlling case law, nor are we aware of any, supporting a requirement under the Eighth Amendment that a district court find a non-juvenile defendant permanently incorrigible before imposing a life-without-parole sentence, whether mandatory or discretionary.[5] Miller itself

---

[5] To be sure, the Supreme Court recently granted certiorari to consider whether the Eighth Amendment requires a sentencing court to find a juvenile defendant permanently incorrigible before imposing a discretionary life-without-parole sentence. See Jones v. State, No. 2015-CT-00899-SCT, 2018 WL 10700848, at *1 (Miss. Nov. 27, 2018), cert. granted, 140 S. Ct. 1293 (2020). The Court

indicates the contrary: so long as the defendant's youth is "take[n] into account" in the sentencing process, "a sentencer's ability" to impose a life-without-parole sentence is not "foreclose[d]." 567 U.S. at 480. In any event, ambiguous case law does not give rise to the clear or obvious error necessary to comport with the plain-error construct. See Bennett, 469 F.3d at 50-51. We conclude, therefore, that the claimed error — if error at all — cannot be considered either "clear" or "obvious." It follows that plain error is plainly absent.[6]

## C. The Reasonableness Challenge.

The final leg of our journey brings us to the defendant's challenge to the reasonableness of his sentence. This challenge has three components. First, the defendant argues that the sentencing court failed to make a finding that he was permanently incorrigible — a finding that he envisions as indispensable to a life-without-parole sentence. Second, he argues that a manifest sentencing disparity renders his sentence unreasonable. Third, he

---

heard oral argument in that case on November 3, 2020. We need not await a ruling in Jones, though, given our determination that twenty-year-old defendants are not juveniles entitled to the prophylaxis of the Miller rule.

[6] Because the proponent of "plain error must carry the devoir of persuasion as to all four" elements needed to comprise plain error, United States v. Pinkham, 896 F.3d 133, 136-37 (1st Cir. 2018), our conclusion that the defendant has failed to satisfy the second element renders it unnecessary to address the other three elements.

argues that the sentence is so draconian as to be substantively unreasonable.  We address these arguments sequentially.

1.  **Permanent Incorrigibility.**  In a single line in his brief, the defendant suggests that his sentence is substantively unreasonable because the district court made no express finding that he was incapable of rehabilitation (or put another way, that he was permanently incorrigible).  This ipse dixit is offered up without any explication and without citation to pertinent authority.

We do not gainsay that the likelihood of rehabilitation is a relevant factor in the sentencing calculus.  See United States v. Martin, 520 F.3d 87, 93-94 (1st Cir. 2008).  That is materially different, though, from the proposition asserted by the defendant, namely, that an antecedent finding of permanent incorrigibility is essential to render a life-without-parole sentence substantively reasonable.  The defendant advances the latter proposition in general terms, but he wholly fails to put any flesh on its bare bones.  He neither develops the argument nor accompanies it with even a shred of authority.

We long have warned that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  The skeletal presentation of this argument in the defendant's brief "leav[es] the court to do

counsel's work" — and that is not our proper province.  Id.
Consequently, we deem the defendant's claim waived.

      **2.  Disparity.**  Contemporaneous with the prosecution of
the defendant, the government entered into a plea agreement with
a coconspirator, Joel Martinez.  The district court sentenced
Martinez to a forty-year term of immurement.  The defendant alleges
that the gulf between Martinez's sentence and his life-without-
parole sentence renders his sentence unreasonable.  Assuming,
without deciding, that this claim of disparity engenders de novo
review (the most defendant-friendly of the possible alternatives),
the claim nonetheless fails.

      We have held before — and today reaffirm — that when a
defendant makes a claim of sentencing disparity, he "must compare
apples to apples."  United States v. González-Barbosa, 920 F.3d
125, 131 (1st Cir. 2019).  Other than pointing to the obvious fact
that both men were convicted of the same crime — RICO conspiracy
— the defendant makes no real attempt to develop a match between
his circumstances and Martinez's circumstances.  And in any event,
the record plainly shows that he is attempting to compare apples
to kumquats.  We catalog a few of the material discrepancies that
distinguish Martinez's case from that of the defendant.

      To begin, Martinez committed one murder, whereas the
defendant committed two.  What is more, Martinez accepted
responsibility for his unlawful actions, whereas the defendant did

not.  And in addition, Martinez pleaded guilty, whereas the defendant elected to stand trial.  Courts should tailor sentences to respond to the culpability of individual defendants and to the nature and circumstances of the crimes they have committed.  See United States v. Alexander, 958 F.3d 1, 11-12 (1st Cir. 2020); United States v. Flores-Machicote, 706 F.3d 16, 20-21 (1st Cir. 2013).  When defendants' circumstances are materially different, a claim of sentencing disparity will not wash.  See United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015); cf. United States v. Reverol-Rivera, 778 F.3d 363, 366-67 (1st Cir. 2015) (finding no disparity when one codefendant played a leadership role in the crime while the other was subordinate); United States v. Dávila-González, 595 F.3d 42, 50 (1st Cir. 2010) (finding no disparity when one codefendant pleaded guilty and the other proceeded to trial); United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005) (finding no disparity when one codefendant cooperated promptly while the other did so "belated[ly] and grudging[ly]").  That is precisely the situation here.

In an effort to blunt the force of this reasoning, the defendant suggests that he was coerced into going to trial and, relatedly, that he could not accept responsibility for his crimes because the government insisted on a life sentence during plea negotiations.  These suggestions elevate hope over reason.

Generally, a criminal defendant has no right to a plea bargain. See Lafler v. Cooper, 566 U.S. 156, 168 (2012); United States v. Skerret-Ortega, 529 F.3d 33, 37 (1st Cir. 2008). It defies logic, then, to argue that the government's refusal during plea negotiations to commit to recommending a reduced sentence constituted coercion when the government had no obligation to offer any kind of plea deal at all. See United States v. Kenney, 756 F.3d 36, 48 (1st Cir. 2014). Nor can the lack of what a defendant may consider a sweet deal be understood as precluding him from accepting responsibility for his crimes. Describing such events as amounting to coercion would drain that term of any plausible meaning. After all, a party is not coerced simply because the counter party pursues a course of action that is well within its rights.

3. **Substantive Reasonableness.** Finally, the defendant calumnizes his sentence as substantively unreasonable. This assignment of error is rooted in 18 U.S.C. § 3553(a), which rehearses the type of factors that a sentencing court ought to consider in order to impose a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of condign punishment. The defendant submits that because the risk of recidivism will be miniscule once he achieves a certain age (say, his "fifties or sixties"), a life-without-parole sentence is unduly severe and, thus, substantively unreasonable.

We review the defendant's challenge to the substantive reasonableness of his sentence for abuse of discretion. See Holguin-Hernandez v. United States, 140 S. Ct. 762, 766 (2020). The key question is whether the challenged sentence is justified by a "plausible sentencing rationale and reaches a defensible result." United States v. Cameron, 835 F.3d 46, 52 (1st Cir. 2016) (quoting United States v. Breton, 740 F.3d 1, 19 (1st Cir. 2014)).

In this instance, the defendant posits that these criteria are not satisfied because a life-without-parole sentence is disproportionate to the risk of his recidivism. Such a characterization of the sentence, though, overlooks that protecting the public from future crimes is only one of the goals that a sentencing court must take into account. See 18 U.S.C. § 3553(a). The court also must weigh, for instance, factors such as the nature and circumstances of the offense of conviction, the history and characteristics of the offender, the seriousness of the offense, and the need for deterrence. See id.

Here, the district court went to considerable length in articulating its sentencing rationale. The court took note of the defendant's relative youth and difficult upbringing but nonetheless concluded that the heinous nature of the defendant's actions and his utter lack of remorse called for a life-without-parole sentence. The court's rationale was plausible: there can be no doubt that the defendant played a leadership role in an

organization that wreaked havoc in the Boston area, that the crimes committed by the organization were serious, and that the predicate offenses for which he was personally responsible were both premeditated and vicious. Nor can there be any doubt that the defendant has never expressed the slightest remorse either for butchering two teenagers or for his participation, more generally, in MS-13's widespread criminal activity.

So, too, the sentence itself was defensible. Where, as here, the substantive reasonableness of a sentence is questioned, a reviewing court's inquiry must recognize that "[t]here is no one reasonable sentence in any given case but, rather, a universe of reasonable sentencing outcomes." United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011). What is more, when — as in this case — a defendant challenges a sentence that falls within a properly calculated GSR, he must carry the heavy burden of convincing us that the district court acted unreasonably in imposing the sentence. See id. at 592-93.

Here, the defendant has failed to carry that heavy burden. The district court concluded that the grisly nature of the facts in this case warranted a life-without-parole sentence. Seen in the lurid light of the totality of the circumstances, we conclude that the district court acted within the ambit of its discretion by imposing a life-without-parole sentence. Such a sentence falls within the wide universe of substantively

reasonable sentences for the offense of conviction.  Hence, the defendant's assignment of error fails.

## III. CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed.**