# United States Court of Appeals
## For the First Circuit

Nos. 21-1708, 22-1610

UNITED STATES OF AMERICA,

Appellee,

v.

NATANAEL ACEVEDO-OSORIO,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Montecalvo, Lipez, and Thompson,
Circuit Judges.

José David Rodríguez, Research and Writing Specialist, with whom Eric Alexander Vos, Federal Public Defender, and Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appeals Division, were on brief, for appellant.

Gregory B. Conner, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Maria E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

September 24, 2024

**LIPEZ, <u>Circuit Judge</u>**. Appellant Natanael Acevedo-Osorio ("Acevedo") pleaded guilty to one count of coercion and enticement of a minor. Pursuant to the plea agreement, Acevedo and the government jointly recommended a sentence of 120 months' imprisonment, the statutory minimum. Though such a sentence fell well below the Guidelines sentencing range calculated for Acevedo, the government offered no explanation for its sentencing recommendation at the sentencing hearing. The court proceeded to sentence Acevedo to 292 months in prison -- more than double the sentence asked for by the parties, an increase of fourteen years. The court also imposed a condition of supervised release prohibiting Acevedo from having unsupervised contact with any minor, including his children, and it ordered him to pay a special assessment and restitution.

Acevedo now raises a bevy of challenges to this sentence on appeal, highlighting both the government's lack of any explanation for the negotiated sentence at the sentencing hearing and the severity of the sentence and release conditions imposed. We agree with Acevedo that the government breached the plea agreement, as its laconic approach to the sentencing hearing "undermine[d] the benefit of the bargain." <u>United States</u> v. <u>Frazier</u>, 340 F.3d 5, 10 (1st Cir. 2003) (internal quotation marks omitted). Even so, we conclude that -- under the circumstances now before us -- the sentencing court's tacit endorsement of the

government's breach does not constitute plain error, and we otherwise affirm the length of the sentence as reasonable. For the reasons laid out below, we also affirm the restriction on Acevedo's unsupervised contact with his children, but we vacate and remand the special assessment and restitution orders.

## I.

### A. Factual Background

Our description of the facts comes from the plea agreement, the change of plea colloquy, the presentence investigation report ("PSR"), and the transcript of the sentencing hearing. See United States v. Diaz-Serrano, 77 F.4th 41, 44 (1st Cir. 2023).

The relevant events concern Acevedo's sexual contact with and solicitation of sexually explicit material from S.Q.R. Acevedo met S.Q.R. in 2016 at a boxing gym. The first sexual contact occurred in 2018, when Acevedo was twenty-five and S.Q.R. was fifteen. Over the ensuing months, Acevedo subsequently had sex with S.Q.R. many more times, and, on one occasion, Acevedo took pictures of S.Q.R. without her knowledge while she slept, including one in which she was naked, which he then threatened to disseminate. When S.Q.R.'s mother became aware of Acevedo's treatment of her daughter, she reported Acevedo to the police[1] and

---

[1] The record does not explain the outcome of this complaint to the police.

sent S.Q.R. from Puerto Rico to Pennsylvania to live with S.Q.R.'s father.

Acevedo continued to communicate with S.Q.R., using messaging apps and social media, to solicit and receive sexually explicit depictions of S.Q.R. On one occasion, during a video chat, he asked S.Q.R. to perform sexual acts, and, unbeknownst to her, recorded her doing so. Acevedo threatened to disseminate the video unless she sent him more sexually explicit material, which she did. Acevedo also pressured S.Q.R. to return to Puerto Rico and live with him, which S.Q.R. unsuccessfully attempted to do. After this event, her father confiscated her cell phone, but the two maintained communication using another device.

Eventually, Acevedo sent a naked picture of S.Q.R. to one of her coworkers, which prompted S.Q.R. to quit her job and move to Oklahoma to live with her brother. Afterward, Acevedo continued to solicit and receive explicit photos from S.Q.R., which he again threatened to distribute. He also demanded to know her whereabouts, commanded her to respond to his communications instantly, and peppered her with jealous questions about her sexual activity. Whenever she failed to respond promptly or provide explicit photos of herself, he berated her with foul language. All told, between June and August of 2019, the period charged in the indictment, when S.Q.R. was 16 years old, Acevedo received at least forty sexually explicit photos of her.

S.Q.R. returned to Puerto Rico in August 2019. After learning of her return, Acevedo instructed her to see him within forty-eight hours. He threatened to pay someone to burn her mother's car, break down her door, and abduct her if she refused. That night, the car of S.Q.R.'s mother exploded after Acevedo purportedly paid someone to set it on fire.

**B. The Indictment and Plea Agreement**

In 2019, a grand jury returned a three-count indictment against Acevedo, charging him with the production of child pornography, see 18 U.S.C. § 2251(a), (e) (Count 1); coercion and enticement of a minor, see 18 U.S.C. § 2422(b) (Count 2); and receipt of child pornography, see 18 U.S.C. § 2252(a)(2)(A), (b)(1) (Count 3). Acevedo agreed to plead guilty to coercion and enticement of a minor in exchange for the dismissal of Counts 1 and 3.

The plea agreement included a total offense level calculation of 29, reflecting a base offense level of 32 because the offense involved "causing . . . a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct," U.S.S.G. § 2G1.3(c)(1); see also id. § 2G2.1(a), with a three-level reduction for acceptance of responsibility, see id. § 3E1.1. The parties did not stipulate to a criminal history category ("CHC"). Regarding the sentence to be recommended, the agreement stated:

After due consideration of the relevant factors enumerated in 18 U.S.C. § 3553(a), in exchange for the defendant pleading guilty to Count Two of the [i]ndictment, the parties will request the mandatory minimum sentence of one hundred twenty (120) months. The parties agree that the defendant shall serve at least five years of supervised release. The defendant agrees that the sentence range[2] is reasonable pursuant to Title 18, United States Code, § 3553(a).

In the statement of facts incorporated into the plea agreement, Acevedo admitted only that he "requested [S.Q.R.] to send him sexually explicit images of her through the WhatsApp Messaging Application and then threatened to disseminate her images if she did not comply with his demands." The statement also noted that S.Q.R.'s phone contained sexually explicit images of herself with timestamps corresponding to written requests from Acevedo for such images. The district court accepted Acevedo's guilty plea.

## C. The PSR

The PSR outlined Acevedo's alleged acts in much more specific and lurid detail than the admissions in the plea agreement. Of particular significance, the PSR revealed that Acevedo had not only threatened to disseminate explicit images of S.Q.R. but had actually done so; that he had received at least

---

[2] Notwithstanding use of the word "range," we understand this word to refer to the jointly recommended 120-month sentence. The parties do not suggest otherwise.

- 6 -

forty explicit images of her; that he had frequent sexual contact with her starting when she was fifteen; and that he had threatened to pay someone to burn her mother's car shortly before it exploded. With one exception,[3] this information was drawn from unsworn, arguably uncorroborated statements by S.Q.R. to law enforcement and in her victim impact statement.

The PSR calculated a total offense level of 38. As in the plea agreement, this calculation included a base offense level of 32, see U.S.S.G. §§ 2G1.3(c)(1), 2G2.1(a), and a three-level decrease for acceptance of responsibility, see id. § 3E1.1. But the calculation in the PSR added a two-level increase for knowingly distributing sexually explicit material involving a minor, see id. § 2G2.1(b)(3); a two-level increase for using a computer or interactive computer service to entice a minor to engage in sexual conduct, see id. § 2G2.1(b)(6)(B); and a five-level increase for engaging in a pattern of prohibited sexual activity with a minor, see id. § 4B1.5(b).

The PSR also included a criminal history score of five -- three points for a prior firearms conviction, see id. § 4A1.1(a), and two points for committing the instant offense during a term of probation.[4] That score placed Acevedo in the CHC

---

[3] According to the PSR, the FBI case agent verified the fact that S.Q.R. sent Acevedo at least 40 sexually explicit images.

[4] In 2023, the Guidelines were amended to eliminate the automatic application of two criminal history points for offenses

- 7 -

of III, yielding a Guidelines sentencing range of 292-365 months. U.S.S.G. ch. 5, pt. A (sentencing table). The PSR noted that Acevedo had experienced trauma, including a turbulent childhood and the murders of both his father and brother, as a mitigating factor to consider. On the other hand, the PSR stated that Acevedo's threatening and abusive conduct, as well as his violation of probation, "demonstrat[ed] [Acevedo's] total disregard for the law."

## D.  **The Sentencing Hearing**

At the sentencing hearing, Acevedo's counsel objected to the PSR's reliance on S.Q.R.'s unsworn statements in its statement of facts and victim impact statement. Counsel also argued that some of the statements were unrelated to the crime of conviction. The sentencing court overruled that objection, stating broadly that "the information provided by the victim is reliable and verified enough" to include in the PSR as discovery information pertinent to the indicted conduct and noting that the sentencing enhancements supported by those statements do not require a conviction.

Counsel next objected to the recommendation in the PSR of a special assessment of $5,000 pursuant to the Justice for

committed during probation previously imposed under U.S.S.G. § 4A1.1(d). This amendment is not relevant to the issues on appeal.

Victims of Trafficking Act ("JVTA"), see 18 U.S.C. § 3014(a), arguing that it was inapplicable because Acevedo was indigent. The court denied that objection but said it would reconsider if "Mr. Acevedo can later indicate that he will not be able to pay the $5,000 because of inability to have a job." Lastly, counsel objected to the PSR's proposed condition of supervised release that would restrict him from having unsupervised contact with his own minor children.[5] At the court's prompting, the probation officer explained that Acevedo would be able to contact his children with a chaperone, and that the restriction could later be lifted with the approval of his probation officer, his mental health treatment provider, and the children's mothers. On that understanding, the court overruled the objection.

With respect to Acevedo's requested sentence, Acevedo's counsel emphasized Acevedo's turbulent upbringing and the recent murder of his brother as mitigating factors. She also pointed to the ongoing support of his family, the mothers of his children, and his boxing coach as evidence of his good character. Lastly, counsel noted that Acevedo would have to serve one year in state

---

[5] The proposed condition provided: "[Acevedo] shall not have unsupervised contact as to any other related or non-related child below the ages of 18, specifically his children, unless determined to be appropriate by the treatment provider and the Probation Officer and always in the presence of his children's mothers." To be clear, Acevedo has not challenged the restriction against unsupervised contact with minor children other than his own.

prison due to the revocation of his probation and would have to register as a sex offender as additional consequences of his crime. Counsel argued that these considerations supported the jointly recommended 120-month sentence.

The government offered only the following: "Good morning, Your Honor. On behalf of the Government, we would be recommending 120 months pursuant to the plea agreement. Thank you."

Agreeing with the PSR, the court calculated a total offense level of 38 and a CHC of III, for a Guidelines sentencing range of 292 to 365 months. After recounting Acevedo's criminal history and the PSR's description of events, the court found Acevedo's "abusive and threatening conduct" outweighed any mitigating circumstances. The court stated that the recommended 120-month sentence "does not reflect the seriousness of Mr. Acevedo's offense, does not promote respect for the law, does not protect the public from future crimes from Mr. Acevedo, and does not address the issues of deterrence and punishment." It then sentenced Acevedo to 292 months' imprisonment, the bottom of the calculated Guidelines sentencing range.

Consistent with the recommendation in the PSR, the court also imposed a fifteen-year term of supervised release, three times greater than the five-year term recommended by the plea agreement, and the condition that he have no unsupervised contact with any

minors, including his children. The court ordered the $5,000 JVTA assessment. The court also ordered Acevedo to pay restitution but opted to defer deciding the amount to later proceedings. In a subsequent filing, the government requested $3,275 of restitution for the destruction of S.Q.R.'s mother's car. Before Acevedo could file a response, the court granted that request.

In this timely appeal, Acevedo argues that the government breached the plea agreement. He also challenges the sentence as procedurally unreasonable, and he seeks vacatur of the restriction on unsupervised access to his children, the JVTA assessment, and the restitution order.

## II.

We begin with Acevedo's 292-month sentence.

### A. Breach of the Plea Agreement

Given that Acevedo did not assert that the government breached the plea agreement during the sentencing proceedings, our review is for plain error. See United States v. Sierra-Jiménez, 93 F.4th 565, 570 (1st Cir. 2024). To satisfy this "rigorous" standard, United States v. Ortiz, 741 F.3d 288, 293 (1st Cir. 2014), Acevedo must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings," United

States v. Cheveres-Morales, 83 F.4th 34, 42-43 (1st Cir. 2023) (alteration in original).

### 1. Background Law

"There is no doubt whatsoever that plea agreements play an 'important role . . . in our criminal justice system.'" United States v. Cortés-López, 101 F.4th 120, 127 (1st Cir. 2024) (omission in original) (quoting Frazier, 340 F.3d at 10). After all, plea bargains facilitate the "prompt" administration of justice, thus warding off the "corrosive impact" on defendants of lengthy pretrial detention, "protect[ing] the public" when such detention is not imposed, and "enhanc[ing] . . . the rehabilitative prospects of the guilty." Frazier, 340 F.3d at 10 (quoting Santobello v. New York, 404 U.S. 257, 261 (1971)). Plea bargaining also "benefits a host of [other] important constituencies," including the government and the public in the form of preserved resources and efficient law enforcement, as well as victims of crimes, who secure a quick and final judgment. Jeffrey Bellin, Plea Bargaining's Uncertainty Problem, 101 Tex. L. Rev. 539, 548-49 (2023).

Pleading guilty is also a weighty decision for a defendant, who typically agrees to waive important constitutional rights in exchange for the government's promise to lend its "prestige" to the defendant's requested sentence, and with it the added "potential to influence the district court" to accept the

agreed-upon sentence. United States v. Velez Carrero, 77 F.3d 11, 11-12 (1st Cir. 1996) (emphasis omitted). At bottom, hence, our strict enforcement of plea agreements stems from our desire to protect defendants from forsaking their fundamental trial rights in exchange for empty promises, see Frazier, 340 F.3d at 10. Accordingly, to preserve faith in the plea-bargaining process, "we 'hold prosecutors to the most meticulous standards of promise and performance.'" United States v. Brown, 31 F.4th 39, 50 (1st Cir. 2022) (internal quotation marks omitted) (quoting United States v. Marín-Echeverri, 846 F.3d 473, 478 (1st Cir. 2017)). As this formulation implies, traditional contract principles guide our assessment of the plea agreement and the government's adherence to it. Id.; see also Puckett v. United States, 556 U.S. 129, 137 (2009) ("[P]lea bargains are essentially contracts.").

Broadly speaking, the government may breach a plea agreement in two ways. First, it can breach the agreement's express terms by doing something that it promised not to do, see, e.g., Santobello, 404 U.S. at 262 (finding breach when government promised to make no sentencing recommendation but did so), or failing to do something that it promised to do, see, e.g., Velez Carrero, 77 F.3d at 11-12 (finding breach when government promised to oppose an offense level adjustment but instead "ma[de] no suggestion to the court" as to a potential adjustment).

- 13 -

Second, even when the government is in "technical compliance" with the plea agreement's express terms, the prosecutor's actions may implicitly "undercut" the deal. United States v. Almonte-Nuñez, 771 F.3d 84, 89, 90 (1st Cir. 2014). As we have often stated, the government may not merely pay "lip service" to the plea agreement, "reaffirm[ing] a promise to the defendant out of one side of [its] mouth" but "try[ing] to subvert it out of the other side." Id. at 91. After all, "as in all contracts, plea agreements are accompanied by an implied obligation of good faith and fair dealing." Frazier, 340 F.3d at 11 (quoting United States v. Ahn, 231 F.3d 26, 35-36 (D.C. Cir. 2000)); see also Cortés-López, 101 F.4th at 128 ("[T]he defendant is entitled to both the 'benefit of the bargain struck in the plea deal and to the good faith of the prosecutor.'" (quoting United States v. Lessard, 35 F.4th 37, 42 (1st Cir. 2022))).

While there is no "magic formula" for evaluating claims of breach, United States v. Gonczy, 357 F.3d 50, 54 (1st Cir. 2004), the government's "overall conduct must be reasonably consistent with making [the agreed-upon] recommendation, rather than the reverse," United States v. Canada, 960 F.2d 263, 269 (1st Cir. 1992). Put another way, we must examine the "net effect of the government's behavior" to determine whether, on balance, it has "undermine[d] the benefit of the bargain." Cortés-López, 101 F.4th at 128 (internal quotation marks omitted) (quoting Frazier,

340 F.3d at 10). We thus must examine the totality of the circumstances in a case-by-case approach. Id.

Typically, cases of implicit breach involve the government saying or doing something that could signal to the sentencing court its dissatisfaction with the agreed-upon sentence. See United States v. Miranda-Martinez, 790 F.3d 270, 275 (1st Cir. 2015) (noting that breach may occur when the prosecutor engages in "implicit advocacy" for a result contrary to the plea agreement). In Canada, for instance, we found that the prosecutor had engaged in such a wink and a nod by making only "grudging and apologetic" comments in support of the agreed-upon sentence while stressing the need for "a lengthy period of incarceration" and emphasizing facts that supported an enhancement not contemplated by the plea agreement. 960 F.2d at 269 (internal quotation marks omitted). Likewise, in Gonczy, the prosecutor ostensibly stood by the plea agreement's recommendation but then emphasized the harmful consequences of the defendant's acts so much that no "impartial observer [would] think that [the government] thought [the agreed-upon sentence] was . . . adequate." 357 F.3d at 54; see also United States v. Mojica-Ramos, 103 F.4th 844, 850 (1st Cir. 2024) (finding breach where government called the defendant "exception[ally]" dangerous and adduced copious evidence of uncharged criminal behavior); Cortés-López, 101 F.4th at 132-33 (finding breach where,

- 15 -

unprompted, the government endorsed the Guidelines calculation in the PSR rather than the less harsh calculation in the plea agreement).

On the other hand, the government ordinarily has no "obligation . . . to further explain its recommendation," even in the case of a downward variance, "when such an obligation is not explicit in the plea agreement." United States v. Cruz-Agosto, 102 F.4th 20, 26 (1st Cir. 2024); see also Lessard, 35 F.4th at 44 (holding that, unless contemplated by the plea agreement, the government has "no affirmative obligation of either advocacy or explication"). Nor must the government present the recommended sentence enthusiastically. Cruz-Agosto, 102 F.4th at 25. Indeed, unless expressly disallowed by the terms of the plea agreement, the government has a right to explain to the court its rationale for agreeing to and recommending the sentence in terms unfriendly to the defendant, by, for example, explaining that the sentence is warranted by the need for punishment, so long as it does not imply that a greater sentence is called for. See, e.g., Brown, 31 F.4th at 50-51 (finding no breach where, despite emphasizing that the defendant had acted "reckless[ly]," the government's conduct was consistent with recommending the agreed-upon sentencing range).

These limitations accord with traditional contract principles. While the government must act in good faith, Frazier, 340 F.3d at 11, that duty only prohibits the government from

interfering with a defendant's reasonably expected benefit of the bargain, Metcalf Constr. Co. v. United States, 742 F.3d 984, 991 (Fed. Cir. 2014). It does not impose upon the government additional "duties beyond those in the express contract or create duties inconsistent with the contract's provisions." Id. (quoting Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 831 (Fed. Cir. 2010)); but see id. (explaining that the implied duty of good faith and fair dealing "prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value").

Notwithstanding our general rule that the government has no implied duty to explain a plea deal's recommended sentence, we have recognized that the government may be obliged to offer "some minimal explanation" in the rare circumstance in which the parties agree to jointly recommend a sentence that amounts to such a "dramatic downward variation" that, without some justification by the government, "the district court [would be] left to speculate about what rationale might reasonably support such a seemingly off-kilter, well-below guidelines recommendation." Cortés-López, 101 F.4th at 132-33. Thus, in Cortés-López, we found that the government was obliged to provide some justification for its recommendation, pursuant to the plea agreement, of what appeared to be an extremely lenient sentence -- twenty-four months'

probation -- as compared to the calculated low-end sentence of seventy-eight months' imprisonment laid out in the PSR. Because the recommended sentence differed from the applicable Guidelines sentence so drastically, in both degree and in kind, the government's "reserve" could only be interpreted as "a repudiation of the agreement."[6] Id. at 133.

Finally, despite the government's obligation to honor the bargain struck in the plea agreement, we have recognized that the government has "a concurrent and equally solemn obligation to provide relevant information to the sentencing court." Almonte-Nuñez, 771 F.3d at 86, 90; see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 1B1.4 (same). At times, this obligation to the court may come into "tension" with "the fact that 'certain factual omissions,

---

[6] We note that in Cruz-Agosto -- a decision issued just four days after Cortés-López -- we stated that "we have never imposed an obligation on the government to further explain its recommendation for a downwardly variant sentence." Cruz-Agosto, 102 F.4th at 26 (emphasis added). However, Cruz-Agosto does not cite Cortés-López, and we assume that the later panel was simply unaware of that just-issued opinion requiring explanation in certain extreme circumstances. In any event, the jointly recommended downward variance in Cruz-Agosto -- which was only twenty months shorter than, or about 35% less than, the lower end of the Guidelines range -- was far less significant than the "dramatic" variance requested in Cortés-López.

helpful to the defendant, may be an implicit part of the bargain in a plea agreement.'" United States v. Davis, 923 F.3d 228, 237 (1st Cir. 2019) (internal quotation marks and alteration omitted) (quoting Miranda-Martinez, 790 F.3d at 274).

In assessing the government's conduct, we must balance these competing interests, recognizing that the government will rarely breach a plea agreement merely by providing relevant information to the court that happens to be unfavorable to a defendant, so long as it does not cross the line into express or implicit advocacy for a greater-than-agreed-upon sentence recommendation. See Almonte-Nuñez, 771 F.3d at 90 (finding no breach where the government agreed that there was a factual basis for an offense-level adjustment not contemplated by the plea agreement but continued to advocate for the agreed-upon sentence). It is particularly significant in the breach analysis when the information provided by the government came at the court's prompting. See, e.g., id.; United States v. Saxena, 229 F.3d 1, 7 (1st Cir. 2000) ("We consider it important that the AUSA's remarks came at the court's urging and in direct response to defense counsel's attempt to put an innocent gloss on the post-plea activities.").

### 2. Discussion

Acevedo argues that, during the sentencing hearing, the government both breached the plea agreement's express terms and

implicitly repudiated it. We need not treat these theories of breach as wholly separate. Because we assess the totality of the circumstances, we must consider both the terms of the agreement and the government's conduct, viewed holistically, to assess whether, overall, the government acted consistently with Acevedo's reasonable expectations. See Canada, 960 F.2d at 268-70 (concluding that the government had breached the plea agreement based on explicit and implicit factors).

Our focus on Acevedo's reasonable expectations follows from the contract principles discussed above. As noted, plea agreements, like all contracts, "are accompanied by an implied obligation of good faith and fair dealing," Frazier, 340 F.3d at 11 (quoting Ahn, 231 F.3d at 35-36), which obligates the government to refrain from "acts or omissions that . . . are inconsistent with the contract's purpose and deprive the other party of the contemplated value," Metcalf Const. Co., 742 F.3d at 991; see also Restatement (Second) of Contracts § 205 (Am. L. Inst. 1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"); 23 Williston on Contracts § 63:22 (4th ed. 2024) ("[W]hen one party performs the contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, there is a breach of the covenant of good faith and

- 20 -

fair dealing."). Accordingly, in construing plea agreements, "[t]he touchstone is the 'defendant's reasonable understanding' of the agreement." United States v. Gardner, 5 F.4th 110, 114 (1st Cir. 2021) (quoting United States v. Conway, 81 F.3d 15, 17 (1st Cir. 1996)); cf. United States v. Gall, 829 F.3d 64, 72 n.6 (1st Cir. 2016) (citing cases for the general proposition that a court's construction of a plea agreement should align with the reasonable expectations of the parties). The government's conduct must be "reasonably consistent," Canada, 960 F.2d at 269, with the benefit of the bargain that induced the defendant to forgo important constitutional trial rights and instead admit guilt.

The agreement states that "[a]fter due consideration of the relevant factors enumerated in 18 U.S.C. § 3553(a), in exchange for the defendant pleading guilty to Count Two of the Indictment, the parties will request the mandatory minimum sentence of one hundred twenty (120) months." Acevedo argues that the phrase "[a]fter due consideration of the relevant factors" obligated the government, during the sentencing hearing, to contextualize its recommendation within the sentencing factors. Another possible interpretation, however, is that this reference merely reflects the parties' understanding that the sentence aligns with the sentencing factors. "[W]hen the words of a plea agreement are unclear, extrinsic evidence may be considered to clarify the parties' understanding." Gall, 829 F.3d at 72. Neither party,

however, points to extrinsic evidence clarifying the agreement's meaning, and our independent review of the record is likewise unavailing. We thus fall back on the general contract principle that, as the drafter of the agreement, "[a]mbiguities in plea agreements are construed against the government." United States v. Newbert, 504 F.3d 180, 185 & n.3 (1st Cir. 2007); see also United States v. Giorgi, 840 F.2d 1022, 1026 (1st Cir. 1988) ("Given the relative interests implicated by a plea bargain, we find that the costs of an unclear agreement must fall upon the government."). Therefore, the phrase, even if ambiguous, informs our understanding of what Acevedo reasonably expected to get out of pleading guilty: a sentencing hearing in which the court would understand why, under the relevant sentencing factors, the government believed a 120-month sentence was appropriate.

Hence, to resolve Acevedo's claim that the government implicitly repudiated the agreement with its terse presentation, we must determine if the government acted consistently with Acevedo's expectation. Whereas many of our cases finding an implicit breach involved plainly discernable cues to the sentencing judge that the government disapproved of the agreed-upon sentence, see, e.g., Mojica-Ramos, 103 F.4th at 850; Gonczy, 357 F.3d at 54; Canada, 960 F.2d at 268-69, here any such wink or nod by the government was far more subtle. That is, the government never affirmatively sent such a message of disapproval.

Indeed, the prosecutor uttered only 16 words of substance: "On behalf of the Government, we would be recommending 120 months pursuant to the plea agreement."

The government defends that tightlipped approach entirely on the general principle that, absent an express statement in the plea agreement, it has "no affirmative obligation of either advocacy or explication," Lessard, 35 F.4th at 44, even when recommending a substantial downward variance, see Cruz-Agosto, 102 F.4th at 26 (finding no breach where the parties agreed to recommend a thirty-seven-month sentence whereas the Guidelines sentencing range was fifty-seven to seventy-one months). The government's sole reliance on that principle is difficult to square, however, with our recent decision in Cortés-López. See 101 F.4th at 132-33 (finding breach where government's only affirmative acknowledgment of the agreed-upon sentence was its statement that it would "stand by" the agreement, spoken after its unprompted assent to the drastically higher loss amount in the PSR than contemplated by the plea agreement).

As we discuss below, there are several meaningful factual differences between that case and the present circumstance. Nonetheless, the core principle articulated in Cortés-López -- that in certain circumstances the government owes at least a "minimal explanation," id. at 132, when it agrees to jointly recommend a dramatic downward variance -- leads us to

conclude that here "the government's failure to provide at least some explanation for its decision to lend its prestigious imprimatur to such a dramatic downward variation likely caused the district court to view the government's 'stand by' statement as just hollow words, undermining any notion that the government viewed the plea agreement as fair and appropriate," id. at 133.[7]

Most significantly, the jointly recommended sentence here was the statutory minimum of 120 months' imprisonment, whereas the applicable Guidelines sentencing range called for 292-365 months. In other words, the government agreed to recommend a sentence that was, in raw terms, fourteen years less than the minimum sentence called for by the Guidelines, and, in relative terms, less than half as long.

Additionally, similar to Cortés-López, see 101 F.4th at 132-33, we find the government's reserved approach especially remarkable considering the stark differences between the plea agreement and the PSR.[8] As we have noted, the PSR described in

_____

[7] The fact that we decided Cortés-López after Acevedo's sentencing proceeding does not affect our analysis. See United States v. Delgado-Sánchez, 849 F.3d 1, 13 (1st Cir. 2017) ("[P]lain error review requires us to evaluate whether the law is clear now, at the time we are conducting appellate review, regardless of whether the law was unclear at the time of sentencing.").

[8] In Cortés-López, which involved financial fraud, the PSR calculated a much greater loss amount than the one calculated by the parties, which resulted in a far greater total offense level and Guidelines sentencing range that further underscored the lenient sentence recommended pursuant to the plea agreement.

painful detail a long-running, sexually exploitative "relationship" beginning when S.Q.R. was just fifteen years old, characterized by abusive language and threats of humiliation. Moreover, the PSR divulged the production of a sexually explicit video, the exchange of approximately forty sexually explicit photos of S.Q.R., the unwanted distribution of one such photo to her coworker, and the purported destruction of S.Q.R.'s mother's car. By contrast, Acevedo understood that he was pleading guilty to one count of coercion and enticement of a minor, based on the minimal, unadorned admission of soliciting an explicit video on one occasion and a vague admission of threatening to distribute. That sparse narrative informed the parties' agreement to jointly recommend the most lenient possible sentence for that offense, while dismissing the additional charges of production and receipt of child pornography.[9] Ultimately, the revelations in the PSR, which supported several sentencing enhancements absent from the plea agreement, led the probation office to calculate a total offense level and Guidelines sentencing range that dwarfed the one calculated by the parties and painted a damning portrait of Acevedo.

---

[9] We note that the statutory minimum sentence for production of child pornography would have been fifteen years' imprisonment rather than the ten-year statutory minimum for Acevedo's crime of conviction. See 18 U.S.C. § 2251.

We can see no reason why the government would not have been aware of this information when it entered into the plea agreement. Other than some details introduced by S.Q.R.'s victim impact statement, most of the PSR's narrative comes from the government's discovery, particularly S.Q.R.'s statements to investigators.[10] The government thus surely understood that, by agreeing to dismiss the child pornography charges and recommending the most lenient possible sentence despite the severity of Acevedo's wrongful conduct, it was making Acevedo an unusually generous offer that would induce the reasonable expectation, informed by the advice of counsel, that his acceptance of responsibility would yield a sentencing proceeding that gave him some hope of leniency. Yet, despite the stark narrative differences between the plea agreement and the PSR, the government made no effort to explain why it thought a 120-month sentence was still warranted under the sentencing factors. Instead, "the district court was left to speculate about what rationale might reasonably support such a seemingly off-kilter, well-below guidelines recommendation." Cortés-López, 101 F.4th at 133.

_____

[10] Acevedo argues that merely by providing this information to the probation office, the government breached the plea agreement. Given the government's "solemn obligation to provide relevant information to the sentencing court," Almonte-Nuñez, 771 F.3d at 86, 90, we disagree.

In short, Acevedo did not get what he bargained for: a sentencing hearing in which an inevitably skeptical court could at least comprehend why, in the government's view, the sentence was proper. Of course, such a proceeding would not have guaranteed Acevedo the lenient sentence he hoped to secure when he agreed to plead guilty, but it would have at least delivered the promised benefit of a realistic chance at such an outcome. The government's failure to offer a "minimal explanation," id. at 132, for recommending what appeared to be a startingly lenient sentence deprived Acevedo of the added "prestige" necessary for the government's recommendation to have any "potential to influence the district court," Velez Carrero, 77 F.3d at 11-12 (emphasis omitted). In the circumstances of this case, the government's perfunctory performance was thus not "reasonably consistent with making [the agreed-upon] recommendation." Canada, 960 F.2d at 269. Rather, the "net effect of the government's behavior undermine[d] the benefit of the bargain upon which [Acevedo] has relied." Frazier, 340 F.3d at 10 (internal quotation marks omitted).

### 3. Plain Error Review

Though we conclude that the government's failure to explain its sentence recommendation in this case was "tantamount to a repudiation of the agreement," Cortés-López, 101 F.4th at 133, we must still consider whether Acevedo has satisfied the

- 27 -

remaining prongs of our plain-error test. Our analysis ends, however, with the second requirement: that the government's breach had to be clear and obvious in light of existing law. See Cheveres-Morales, 83 F.4th at 43. To rise to that level, the "error must, at the very least, contradict existing law." United States v. Gonzalez, 981 F.3d 11, 22 (1st Cir. 2020). Accordingly, "ambiguous case law does not give rise to the clear or obvious error necessary to comport with the plain-error construct," id., required to vacate Acevedo's sentence.

Notwithstanding our recognition that Cortés-López helps explain why the government's conduct was improper, we perceive enough differences between that case and the present case that we cannot conclude that the "error [was] 'indisputable' in light of controlling law." Gonzalez, 981 F.3d at 22 (quoting United States v. Jones, 748 F.3d 64, 69-70 (1st Cir. 2014)). For one thing, in Cortés-López, we emphasized that the sentence recommendation warranting a minimal explanation from the government was not only much shorter than the Guidelines sentencing range but also took a different form -- probation rather than imprisonment. 101 F.4th at 133. Here, the recommended sentence has a much greater disparity in length, but had no difference "in kind." Id. Additionally, in Cortés-López, the prosecutor made an unprompted statement agreeing with aspects of the PSR that differed from the plea agreement and supported a higher sentence. Id. at 132-33.

- 28 -

While we did not rest our analysis in Cortés-López on that fact alone, the presence of such a statement undermining the plea agreement is a significant factual difference from the present case.

Indeed, as we have noted, other cases identifying an implicit repudiation of the plea deal have involved similar affirmative conduct by the government signaling its dissatisfaction, as opposed to the government's omission here. See, e.g., Mojica-Ramos, 103 F.4th at 850; Gonczy, 357 F.3d at 54; Canada, 960 F.2d at 268-69. Considering this pattern in our past cases, the general principle that the government has "no affirmative obligation of either advocacy or explication," Lessard, 35 F.4th at 44, and the various factors distinguishing Acevedo's circumstances from those present in Cortés-López, we cannot say that the government's omission of an explanation here was a clear or obvious breach so as to satisfy the high bar set by this prong of plain error review. We therefore decline to vacate Acevedo's sentence, notwithstanding the government's breach.

## B. Procedural Reasonableness

Acevedo asserts that his sentence was not supported by a preponderance of the evidence, as it must be, see United States v. Ortiz-Carrasco, 863 F.3d 1, 3 (1st Cir. 2017), because the court's factfinding depended upon statements in the PSR that are, in Acevedo's telling, unreliable. Because Acevedo preserved this

objection, we review the court's factfinding for clear error within the abuse-of-discretion framework that accompanies claims of procedural error.  See United States v. Mejia, 55 F.4th 1, 9 (1st Cir. 2022).  Under this deferential standard, "[w]e must uphold the district court's ruling unless 'we are left with the definite and firm conviction that a mistake has been committed.'"  Sanchez v. Roden, 808 F.3d 85, 90 (1st Cir. 2015) (quoting United States v. Mensah, 737 F.3d 789, 796-97 (1st Cir. 2013)).

The gravamen of Acevedo's complaint is that the district court relied largely on unsworn, uncorroborated statements by S.Q.R. contained in the PSR to calculate the Guidelines sentencing range, as well as to form its qualitative view of Acevedo's conduct.  Acevedo accurately describes the court's reasoning: S.Q.R.'s account in the PSR led the court to calculate a total offense level of 38, including enhancements of seven levels for engaging in a pattern of sexual misconduct with a minor and distributing sexually explicit material of a minor.  Likewise, the PSR's lurid account of a long-running exchange of sexually explicit material and Acevedo's manipulative and threatening behavior clearly influenced the court's sentencing rationale.  S.Q.R. was the source of nearly all these allegations, most of which were not corroborated by any direct evidence.[11]  Our task, therefore, is to

_____

[11] As noted, the fact that Acevedo received forty explicit photos was corroborated by the FBI investigation.  The government's

- 30 -

determine whether the sentencing court's heavy reliance on S.Q.R.'s statements to support these two enhancements and to otherwise guide its sentencing rationale was procedural error.

"[A] district court 'must take pains to base sentencing judgments upon reliable and accurate information.'" United States v. Rodríguez-Cruz, 997 F.3d 362, 366 (1st Cir. 2021) (quoting United States v. Tavano, 12 F.3d 301, 305 (1st Cir. 1993)). According to Acevedo, S.Q.R.'s statements were not reliable because they were unsworn, lacked corroboration, had some internal inconsistency, and included "multiple-level hearsay."[12] This challenge to the reliability of information in the PSR is an uphill battle, as we generally presume that "a PSR bears sufficient indicia of reliability to permit the district court to rely on it at sentencing." United States v. Cyr, 337 F.3d 96, 100 (1st Cir. 2003) (quoting United States v. Taylor, 277 F.3d 721, 724 (5th Cir. 2001)). Acevedo offered the district court no "countervailing evidence or proffers" to challenge the PSR's reliability, as he must to generate a "genuine and material dispute" during

_____

appellate brief also states that the allegation that Acevedo sent an explicit photo to S.Q.R.'s coworker was corroborated by that coworker. We do not rely on this out-of-record representation.

[12] "[N]either the Federal Rules of Evidence nor the Sixth Amendment's confrontation clause applies" during sentencing hearings, and thus a sentencing court may rely on hearsay evidence. United States v. Rondón-García, 886 F.3d 14, 21 (1st Cir. 2018). We understand Acevedo's claim that the statements are hearsay to simply be another reason why they are unreliable.

sentencing.  Id.  Rather, he merely asserted that S.Q.R.'s statements were "unverified" and "unrelated to the crime of conviction."  When faced with "objections to the PSR [that] are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR."  Id.

Acevedo's argument for procedural error thus closely resembles the one we rejected in United States v. Santiago-Colon, 918 F.3d 223, 226 (1st Cir. 2019).  In that case, the defendant challenged the reliability of uncorroborated, uncharged statements by a sexual abuse survivor whose statements were included in the PSR. We explained, just as here, that the defendant's claim failed because he offered no evidence that the statements were unreliable. Id.  Acevedo argues that Santiago-Colon is distinguishable because, in that case, the challenged statements were consistent with the trial testimony of other survivors.  But we did not uphold the sentencing court's factfinding on that basis -- we were satisfied that the PSR was presumptively reliable, and the defendant had failed to prove otherwise.  Id.  The same is true here.

We note, moreover, that S.Q.R.'s statements are consistent with the (minimal) information admitted to by Acevedo in the plea agreement.  See Cyr, 337 F.3d at 100 (noting that the reliability of detailed information in the PSR was supported by less detailed admissions in the plea agreement).  In the plea,

Acevedo accepted responsibility for soliciting explicit photos from S.Q.R. and threatening to distribute them. The plea also confirms that S.Q.R. took explicit photos of herself at the time Acevedo requested them. These acknowledged facts align with S.Q.R.'s allegations, which are far more detailed but ultimately relate to Acevedo soliciting and receiving explicit images from S.Q.R. and then using the photos to coerce and intimidate her.

Because the district court's reliance on S.Q.R.'s statements in the PSR was not clearly erroneous, we reject Acevedo's broad procedural challenge to the district court's factfinding, as well as his attack on the two specific enhancements premised on S.Q.R.'s statements.[13]

---

[13] Acevedo also argues that the two-level enhancement for distribution was unwarranted because the PSR only describes the photo distributed to S.Q.R.'s coworker as a "naked picture," whereas the enhancement applies only to depictions of "sexually explicit conduct," as defined under 18 U.S.C. § 2256(2). See U.S.S.G. § 2G2.1, cmt. 1; see also United States v. Amirault, 173 F.3d 28, 33-35 (1st Cir. 1999) (holding that a photo depicting "mere nudity" does not meet the statutory definition of sexually explicit conduct (analyzing 18 U.S.C. § 2256(2))). This argument is meritless. Most of the photos described in the PSR included "lascivious exhibition of the anus, genitals, or pubic area." 18 U.S.C. § 2256(2). Absent any offer of proof to the contrary, the district court's inference that the photo Acevedo distributed was also of this nature was not clearly erroneous. See Brown, 31 F.4th at 46 ("We will not find clear error in the court's application of the guidelines to the facts 'as long as the district court's decision is based on reasonable inferences drawn from adequately supported facts.'" (quoting United States v. Martin, 749 F.3d 87, 92 (1st Cir. 2014))).

**\* \* \***

In sum, the court did not commit plain error by overlooking the government's breach of the plea agreement. Having also rejected Acevedo's claim of procedural error, we affirm Acevedo's 292-month prison sentence.

**III.**

We next consider the condition of supervised release restricting Acevedo's unsupervised contact with his children.[14] As Acevedo raised this objection to the district court, we review his challenge for abuse of discretion, revisiting legal issues de novo, assessing the district court's factual findings for clear error, and viewing deferentially the court's "judgment calls." United States v. Hood, 920 F.3d 87, 92 (1st Cir. 2019) (quoting Riva v. Ficco, 615 F.3d 35, 40 (1st Cir. 2010)).

The sentencing court must set forth a "reasoned and case-specific explanation" for the conditions of supervised release. United States v. DaSilva, 844 F.3d 8, 11 (1st Cir. 2016) (quoting United States v. Perazza-Mercado, 553 F.3d 65, 75 (1st Cir. 2009)). These conditions must "involve[] no greater deprivation of liberty than is reasonably necessary to achieve the goals of the sentence," and must be "reasonably related both to these goals and to the nature and circumstances of the offense and

---

[14] At the time of sentencing, Acevedo had four minor children: three daughters and a son.

- 34 -

the history and characteristics of the defendant." Id. (quoting Perazza-Mercado, 553 F.3d at 69). We require a "greater justification" for special conditions "that would impair a defendant's relationship with his child[ren]." United States v. Del Valle-Cruz, 785 F.3d 48, 62 (1st Cir. 2015).

While the district court did not expressly explain the restriction on Acevedo's access to his children, the requirement that it explain its reasoning is satisfied "so long as the court's reasoning can be deduced from the record." United States v. Leach, 89 F.4th 189, 201 (1st Cir. 2023). Here, the court solicited, and accepted, an explanation from the probation officer during the sentencing hearing. The probation officer explained that the nature of the offense made the restriction necessary "to protect the community and to protect minors." With regard to Acevedo's children, specifically, the officer explained that Acevedo would have chaperoned contact and that unsupervised visits could be possible, in consultation with mental health professionals and the children's mothers.

Acevedo argues that the restriction is not supported by the record, which shows that he is a good father and that his conduct did not involve a family member or occur inside the familial home. He also points out that during the period charged in the indictment S.Q.R. was sixteen, and, thus, though a minor for the purposes of 18 U.S.C. § 2422(b), she was of the age of

consent in Puerto Rico, see 33 L.P.R. § 4770(a), and that he and S.Q.R. were, as he puts it, "romantically involved, their relationship bearing no resemblance to anything like a parental or familial association." Thus, he asserts, the restriction is not reasonably related to his offense and unduly intrudes upon his parental liberty interests.

The PSR, however, does not describe a "romantic" entanglement. Rather, it describes an exploitative relationship between a teenager and an older man who used abusive language and threats of humiliation to solicit sexually explicit images from her and manipulate her behavior. Although Acevedo is correct that most of these events occurred after S.Q.R. was sixteen years old, their sexual relationship began when she was fifteen, and they met several years before that. We also find it significant that S.Q.R.'s parents put thousands of miles between Acevedo and their child and restricted her access to technology in their repeated efforts to block contact between them. Nonetheless, Acevedo subverted these extensive measures, contacting S.Q.R. through alternative channels and urging her to run away from home. Acevedo's threatening behavior culminated in the distribution of a sexually explicit photo of S.Q.R. and the purported torching of her mother's car.

We have little difficulty distinguishing these circumstances from the facts of previous cases in which we have

vacated restrictions on parental contact. In Del Valle-Cruz, for example, the defendant's instant offense -- failing to update his sex offender registration -- did not itself involve a sexual act, his underlying sexual offense was over a decade old, and the record contained no overtly violent or threatening conduct. See 785 F.3d at 59-64; see also United States v. Fey, 834 F.3d 1, 4 (1st Cir. 2016) (similar); United States v. Cabrera-Rivera, 893 F.3d 14, 33 (1st Cir. 2018) (vacating restriction where defendant lacked "violent inclinations" (quoting United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016)). Rather, the present case resembles other cases upholding similar restrictions in light of the defendant's recent history of violent or threatening behavior. See, e.g., Pabon, 819 F.3d 32-33 (upholding restriction where the defendant had a "copious criminal history" and his offense "involved a prolonged sexual relationship with a minor over whom he was in a position of apparent trust and authority"); United States v. Mercado, 777 F.3d 532, 538-39 (1st Cir. 2015) (upholding restriction in light of the defendant's "persistent criminal involvement"); cf. United States v. Benoit, 975 F.3d 20, 26-27 (1st Cir. 2020) (upholding restriction on defendant having unsupervised contact with his children and distinguishing Del Valle-Cruz partially on the ground that the relevant conduct justifying the restriction was more recent).

As in those cases, we also note that the "conditions imposed by the district court do not comprise an outright ban on the defendant's ability to associate" with his children. Mercado 777 F.3d at 539; see also Benoit, 975 F.3d at 27; Pabon, 819 F.3d at 33. Acevedo remains able to contact his children with supervision, and "[t]here is no basis for believing that the probation officer will unreasonably withhold permission for the defendant to see his own children." Mercado 777 F.3d at 539. Nor is he without redress if that occurs. Id.; see also 18 U.S.C. § 3583(e)(2). Indeed, as noted during the sentencing hearing, the restriction can be modified, including by removing it entirely if his mental health treatment provider and the children's mothers deem it appropriate.

Because the record offers a reasonable explanation for restricting Acevedo's unsupervised contact with his children, see DaSilva, 844 F.3d at 11, we will not disturb the district court's judgment call that such a condition is presently warranted.

**IV.**

Finally, we consider the $5,000 special assessment and the restitution order of $3,275 to S.Q.R.'s mother for the mother's destroyed car.

**A. Special Assessment**

We review the special assessment order for abuse of discretion. See United States v. Procell, 31 F.4th 32, 35 (1st

Cir. 2022) (reviewing JVTA special assessment order for abuse of discretion). Ultimately, however, Acevedo's challenge raises a legal question, which, within our abuse of discretion framework, we review de novo. Hood, 920 F.3d at 92.

The JVTA requires the court to "assess an amount of $5,000 on any non-indigent person or entity convicted" of several offenses, including the offense of coercion and enticement of a minor to which Acevedo pleaded guilty. 18 U.S.C. § 3014(a). Acevedo argues that he adduced copious evidence that he is indigent within the meaning of section 3014(a). He also points out that the district court did not make any finding as to Acevedo's financial condition, but, instead, ordered the assessment and stated that it was open to revisiting the issue if Acevedo was unable to obtain future employment. The government defends the court's "provisional" decision by pointing out that a sentencing court is entitled to consider the defendant's future ability to pay.

The government's defense of the court's order as "provisional" is revealing. The statute speaks in mandatory terms: "[T]he court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense" covered by the statute. 18 U.S.C. § 3014(a) (emphasis added). As other circuits have concluded, this language means that "the district court has no choice but to impose the $5,000 assessment if it

determines that the defendant is non-indigent. And the opposite is also true: the district court cannot impose the assessment on an indigent defendant." United States v. Shepherd, 922 F.3d 753, 757 (6th Cir. 2019); see also United States v. Kibble, No. 20-4106, 2021 WL 5296461, at *3 (4th Cir. Nov. 15, 2021) (stating that "a district court must make a finding [regarding indigency] before imposing the $5,000 special assessment pursuant to the JVTA" (emphasis added)). To be sure, the indigency finding need not be express, so long as the "record is sufficient to permit appellate review." United States v. Rowe, 268 F.3d 34, 39 (1st Cir. 2001); see also Shepherd, 922 F.3d at 760 (applying this principle in the JVTA context). But "[t]here is a difference between an implicit finding of non-indigency and no finding at all," Kibble, 2021 WL 5296461, at *4, and, hence, the record must confirm that such an implicit finding occurred. Here, the government does not even attempt to suggest that the court made an implicit indigency finding, instead admitting that "[i]n effect, the district court deferred ruling on indigency."

The record supports that characterization. At the sentencing hearing, the court asked for the probation officer's evaluation of Acevedo's indigency, and the officer responded that "at this time we don't have enough information," recommending that the court instead "give [Acevedo] a chance to get employment" before "mak[ing] an assessment." The court then overruled

- 40 -

Acevedo's objection to the special assessment, stating that it would "reconsider" the fine "if Mr. Acevedo can later indicate that he will not be able to pay the $5,000 because of inability to have a job."[15] Contrary to the government's suggestion, the court's reference to Acevedo's future employment did not assess his "future earning potential to render him non-indigent." Procell, 31 F.4th at 38. The district court did not make any finding of non-indigency premised on Acevedo's employment prospects, instead indicating that it would make a future indigency finding based on Acevedo's actual employment outcomes.

The court thus erroneously imposed the special assessment without any finding regarding Acevedo's indigency, and, consequently, we vacate the $5,000 assessment. Acevedo further argues that the record establishes his indigency: he has limited income, receives SNAP benefits, lacks assets, and has burdensome child support obligations. That determination properly lies with the district court in the first instance, however, and we therefore remand the issue to the district court. See United States v. Irizarry-Colón, 848 F.3d 61, 70 (1st Cir. 2017).

---

[15] Acevedo notes that, as a consequence of the court's decision to assess the fine but "defer" an indigency finding, Acevedo is presently obligated -- but purportedly unable -- to pay the fine, which means interest may be unnecessarily accruing.

**B. Restitution**

Finally, Acevedo challenges the restitution order of $3,275 for the destruction of S.Q.R.'s mother's car. We disagree with the government that the restitution order should be reviewable only for plain error. The district court granted the government's restitution request -- made in a post-sentencing memo -- before Acevedo had an opportunity to file a timely opposition. Federal Rule of Criminal Procedure 51(b) provides that "[i]f a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." The government's contention that Acevedo forfeited his objection because he had prior notice that some restitution might be awarded in unavailing. He had no notice of the issue on appeal -- whether he owed S.Q.R.'s mother restitution for her car -- until the government's post-sentencing memo. We thus review the restitution order for abuse of discretion, see, e.g., United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018), meaning that, once again, our review is functionally de novo since Acevedo's appeal concerns a legal question, see Hood, 920 F.3d at 92.

Acevedo argues that this restitution order is improper because the Mandatory Victims Restitution Act ("MVRA") authorizes restitution to be paid to the "victim" of a crime,[16] see 18 U.S.C.

---

[16] The MVRA also authorizes restitution to non-victims "if agreed to by the parties in a plea agreement." 18 U.S.C.

§ 3663A(a)(1), (b)(1), yet the district court identified only S.Q.R. as a victim, with her mother being S.Q.R.'s "representative." The government responds that S.Q.R.'s mother was a victim within the statutory definition and the district court understood her as such, and, in any event, she may receive restitution as S.Q.R.'s representative.

The MVRA defines a victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." Id. § 3663A(a)(2). On the face of this definition, we can understand why the government regards S.Q.R.'s mother as a victim.[17] Whether, in our view, the facts show that S.Q.R.'s mother satisfies the statutory definition of "victim" is not the relevant question on appeal, however.

---

§ 3663A(a)(3). Here, the plea agreement does not contemplate restitution to S.Q.R.'s mother.

[17] The MRVA, as relevant here, "appl[ies] in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense-- (A) that is-- (i) a crime of violence, as defined in [18 U.S.C. § 16] [or] (ii) an offense against property . . . ." 18 U.S.C. § 3663A(c)(1). Acevedo was not charged with an offense against property, and we have not opined on whether any of Acevedo's charged offenses qualify as a "crime of violence." But see United States v. Champion, 248 F.3d 502, 506 (6th Cir. 2001) (holding that each of the offenses relevant to this appeal is a "crime of violence"); see also United States v. Williams, 529 F.3d 1, 5 (1st Cir. 2008) ("[I]llicit sexual activity between an adult and a minor . . . poses a significant risk that force will be used in the consummation of the crime."). Nor is it clear that the burning of the car is sufficiently related to the charged offenses to qualify. Acevedo, however, has not raised these issues, and we therefore consider only whether S.Q.R.'s mother is statutorily eligible to receive restitution.

- 43 -

Because such a factfinding properly lies with the district court in the first instance, see Irizarry-Colón, 848 F.3d at 70, the question is whether the district court found S.Q.R.'s mother to be a victim and whether, if not, it properly awarded her restitution anyway.

During the sentencing hearing, the district court expressly identified only one victim: S.Q.R., describing S.Q.R.'s mother not as a victim, but as S.Q.R.'s representative. There is nothing else in the record from which we can infer that the district court nonetheless made an implicit finding that S.Q.R.'s mother is herself a victim when entering its restitution order. The government points out that the PSR identified both S.Q.R. and her mother as victims, but, of course, a district court is not required to agree with the PSR, and the district court notably departed from the language of the PSR in describing only S.Q.R. as Acevedo's victim. Indeed, the court referred in the singular to "the victim" throughout the sentencing hearing, always in reference to S.Q.R. In the government's post-sentencing memorandum, moreover, it likewise referenced one "victim," meaning S.Q.R., and at one time described the damaged property as "her mother's car," while at other times referring to the car as S.Q.R.'s property.[18] In the district court's subsequent

_____

[18] To the extent the district court premised its restitution order on the understanding that the car was S.Q.R.'s property,

unexplained order granting restitution, it again ordered Acevedo to pay restitution to "the victim." In short, on this record, we cannot conclude that the district court made a finding, express or implicit, that S.Q.R.'s mother is a victim within the statutory definition.

The government argues, in the alternative, that S.Q.R.'s mother was entitled to receive restitution for her damaged property as S.Q.R.'s representative. The MVRA provides that "[i]n the case of a victim who is under 18 years of age . . . the legal guardian of the victim . . . may assume the victim's rights under this section." 18 U.S.C. § 3663A(a)(2). We have not previously considered whether this text entitles a victim's representative to restitution for the representative's own losses, but several other circuit courts have rejected that interpretation. See United States v. Casados, 26 F.4th 845, 853 (10th Cir. 2022) ("[The MVRA] limits restitution to losses incurred by the victim, and the victim's representative assumes the right to receive restitution for exactly those losses incurred by the victim, and not [the representative's] own losses."); United States v. Wilcox, 487 F.3d 1163, 1177 (8th Cir. 2007) ("The section does not allow the legal

_____

such a finding would be clearly erroneous, as the record makes clear that the car belonged to S.Q.R.'s mother, not S.Q.R.

guardian to substitute [the guardian's] own losses for those of the victim.").[19]

We agree. The MRVA authorizes a victim's representative only to "assume the victim's rights under this section." 18 U.S.C. § 3663A(a)(2) (emphasis added). In other words, the statute authorizes a representative to collect the restitution owed to the victim for losses the victim suffered. It does not separately authorize restitution for the losses of the victim's representatives. The rest of section 3663A confirms our reading. The statute authorizes "restitution to the victim." Id. § 3663A(a)(1) (emphasis added). As relevant to this case, the statute requires restitution for "damage to or loss or destruction of property of a victim," id. § 3663A(a)(2) (emphasis added), and to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense," id. § 3663A(b)(4) (emphasis added). The statute also specifies that it is only applicable where "an identifiable victim or victims has suffered

---

[19] By contrast, in United States v. Pizzichiello, the Ninth Circuit held that a deceased victim's family could recover restitution for their own travel expenses, reasoning that if the victim had survived, he would have incurred travel expenses of his own. See 272 F.3d 1232, 1241 (9th Cir. 2001). As the Tenth Circuit notes in Casados, see 26 F.4th at 852, Pizzichiello does not engage with the statutory text whatsoever and is thus not a persuasive authority on the statute's plain meaning.

a physical injury or pecuniary loss." Id. § 3663A(c)(1)(B) (emphasis added). And it only contemplates recovery for non-victims when specifically provided by a plea agreement. Id. § 3663A(a)(3).

Simply put, any right of recovery assigned to a victim's representative must relate to a loss suffered by that victim, as the statute describes the term. Since the district court did not make any finding that S.Q.R.'s mother, in addition to being S.Q.R.'s representative, is also a victim of Acevedo's charged conduct in her own right, we reject the government's contention that she is nonetheless entitled to recover for her own losses solely on account of being S.Q.R.'s representative.

The restitution award was thus erroneous. Acevedo asks that we strike the award, without remand. We disagree that that is the proper remedy. As we read the record, the district court never made a finding, one way or the other, about whether S.Q.R.'s mother meets the statutory definition of a victim entitled to restitution. Since such factfinding is the domain of the sentencing court, we will vacate the restitution award and remand the issue for further consideration. See Casados, 26 F.4th at 854 (taking the same approach).

* * *

In sum, we affirm Acevedo's 292-month sentence and the condition of supervised release restricting Acevedo from having

unsupervised contact with his children.  We vacate, however, the special assessment under the JVTA and the restitution order and remand those issues to the district court for proceedings consistent with this opinion.

So ordered.